Please all rise. Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Good morning, please, and please be seated. Your Honor, the first case on the docket this morning is 2-23-0209, Tony Thomas v. Neisendorf, plaintiff's client, v. Abbey Paving & Sealcoating. Doing business as an appellate, as an appellate in the Appellate Corporation and the Appellate Defendant's Appellate. Arguing on behalf of the Appellant, Mr. C. Nicholas Prada. Arguing on behalf of the Appellate, Ms. Meredith Prada. All right, good morning. You notice that we have an empty seat. That does not mean that Justice Jorgensen will not listen to this case. We're having some technical difficulties, and so hopefully she'll be able to pop in. If not, she will review it, and we will issue a decision after consultation with her. So at this point, then, if we're ready, Mr. Kronhauer, you may proceed. Thank you, Justice Hutchinson. Good morning, Justice Kennedy. May it please the Court, counsel. As you all are aware, we're here for a construction of the Jenskates under Section 414 and 343. To start, I kind of want to pick up where my reply brief left off because I'm sure you reviewed it. I want to make sure the record's clear. A draft brief was filed, and Kane was not erroneously decided. It was supposed to be changed. I think Kane is actually a very good case for the plaintiff. I'll take the blame. My associate drafted it. It's supposed to be changed. It wasn't. So Kane was not erroneously decided. Kane, I think, is a roadmap, perfect example of what Abby Paving could have done, should have done in this case to try to delegate the control over safety that they held with their contract under their contract with McHenry. There was, I think, testimony from it might have been your client saying, you know, nobody tells me how to do this. I know how to do my work. So, you know, the rule of completeness. When you read the transcript, Mr. Eisendorf digs trenches for a living. He's a simple guy. When you read the transcript as a whole, what he's saying is they didn't exercise the right to control him. They could have, but they didn't do it. That's what he was saying. If you read the whole transcript, there's multiple times he says he would have listened to Bob Buelow, he would have stopped. If something was unsafe, if Abby told him to stop, he would stop. He's adamant that they had the right to control him. Well, there's no question that he said if somebody told me to stop, I would have stopped, whether it was his company or somebody from Abby or even, I suspect, if somebody from the county walked out the door and said stop, he would have stopped. But his basic position was, you know, I know what I'm supposed to do. He's not going to tell me how to do my job. I mean, I don't think that's the message he's trying to relay, but you bring up a good point that we're going to get into, right? What does 414 apply? And the county court's very good about talking about the confusion around 414. I think the confusion applies in this case. If, to your point, Abby controlled Tom's means, methods, manner, what 414 says is that we don't apply, agency laws apply. So now Abby is responsible for any screw-up by Mr. Nisendorf, even though he works for Camden. Agency applies. 414 applies when something less than control of the operative details and incidental details apply. That's when 4014 takes over, something less than agency. You look at the comments, and the comments are clear on this. As the county court says, if you look at A, A talks about when does 414 not apply. Agency applies. All right? So when does 414 apply? Well, there's something between complete control and no control. 414 applies. And in this case, there is not complete control over Mr. Nisendorf. I don't think that's disputed. You don't hire a sub to go in and tell the sub how they're going to dig their trench, how they're going to pour their gravel. And 414 covers that in comment C, because it says verbatim, it does not mean that the contractor is controlled as to his methods of work or as to the operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way. Right? And Mr. Nisendorf establishes that. Mr. Hanson established that. Mark Patterson established that. But they were not free to do their work when it comes to safety without any type of control by Abbey. And I think the court needs to consider, too, the importance of what is tort law, right? What's the purpose of tort law? Deterrence, public safety. So you have a situation where McHenry County has put out to bid a contract. They have accepted a contract from Abbey Paving, and part of their stipulation is you are going to be solely responsible for safety. That is our expectation, right? There's more to construction than just is this the cheapest price, right? We want a good product that is also going to be done safely for the community. And if the standard becomes, well, the GC didn't control the means and methods of the sub, I mean, 414 liability goes out the window, and you have a situation where general contractors will do the cheapest bid, promise all the safety knowing they're not going to have to pay for it because if someone gets hurt, they're going to say, well, I didn't control the means and methods of this guy digging a trench. All right. Well, let me ask a question. It looks like, at least the facts seem to indicate, that this trench was dug that day and probably before some people arrived, maybe before 730. I think the exit occurs about 734 or something like that. So if Abbey and Mr. Niesendorf's company and the county were supposed to be meeting, are you saying that work should stop until they're done so that safety can be ensured, or what should they have done under your theory? They should have had a trench box or showing should have been used because they were. . . Well, they did have a trench box on site. That's disputed. It's a disputed issue of fact. Okay. The plaintiffs said there wasn't. One witness said there was, I think, on the south side of the building. It's a pretty big parking lot area, and it could have been in a different place, but I was under the impression reading some of the transcript that it was there, it was just being otherwise used. I mean, the plaintiff and his dep said there was no trench box on site and they hadn't used one. So, I mean, basically with the issue in that situation, Judge Jorgensen, which is why another distinguishing factor from Kane that's good for us, there's OSHA regulations that say when this trench hits this many feet, by law, this shoring, this leveling, this bracing, whatever you want to call it, has to be used. It wasn't used in this case. And the meaning involved here wasn't necessarily, I think, about shoring per se. There was some other issue that had arisen while they were digging, and they were trying to, I think, figure out the best cost-effective means to resolve the issue. Well, didn't they find an old pipe they weren't expecting, and that would have prevented some of the shoring if they were going to use that method? There is some testimony to that, but, again, I think that's an issue of fact. Now, if Mr. Nussendorf, I also seem to recall that he was, at one point, he was standing on a pipe. What pipe was he standing on, or is that, have I misinterpreted that? No, he was standing on a pipe, and I believe it was, I think it was either the water pipe being replaced or a natural gas pipe. I don't really recall the type of pipe, but he was standing on a pipe that's on the site. But it was already there, or he was putting it in? I believe it was already there. I think they were uncovering it as part of the sewer work. But, you know, to your point about, well, there's this other gas piping there, unknown piping, you know, the other issue in this case that's not really talked about heavily in the brief is the soil conditions that were reported by Abby to Campton-Morone, which contributed to the cave-in. So, you know, as the testimony was, even if you can't do shoring, right, there's bracing, you can do, and I forget the term, but you basically dig out, do like a stepping procedure, which is all required by OSHA, and it should have been done. What was the testimony about when the soil conditions are discovered? Wasn't there something about you have to dig first before you know whether or not it's stable? I don't recall that testimony, Justice Kennedy. I'm not saying it's not there. Obviously, these cases are very back-dependent. What I recall is the soil conditions were known to be erroneous after this injury occurred because then they were doing a root cause analysis. There's some issue, too, as I recall, that certain training might be appropriate to be doing this type of work, even though your client said, I know what my job is and I know how to do it, and there was training after the fact here? After, correct, and that's a good point, Justice Hutchinson, that, again, is missing from Kane. And if you read the transcript, again, these trench diggers all testified before this, they really didn't have any formal OSHA training. They weren't going through the OSHA competent class. It was just basically they'd been digging trenches for 20 years, and that's what they do. After the injury, obviously, Bob Buelow, Abby, required they go through OSHA training, which, again, unlike Kane, shows that they were solely responsible for training and control of that job site as it relates to safety. And Mr. Buelow is Abby, correct? Yes, correct. He's the OSHA competent person, which I would pose to you. There's something like 27 cases. I've never seen that phrase used in any other case, an OSHA competent person. I've seen safety director. I've seen all sorts of things, but an OSHA competent person designated by Abby to be in charge of safety. And the trial court talks a little bit about, well, Mark Patterson was OSHA competent, I believe. The other Mark and his last name escapes me, but the testimony is cleared by Bill Hanson, even by Mark Patterson. No one at Campton was designated as the safety OSHA competent safety person. That was Bob Buelow, who testimony was used on site at least daily, and if not daily, two to three days. Again, Bill Hanson, who was not a part of this case, testified that if there were changes being done, it came from Bob Buelow through Mark Patterson. I mean, there is an issue of fact whether or not there was some control retained by Abby over at least the safety of the job. There's another question, or at least I had a question. Campton is not working under, per se, a contract because they work with Abby all the time. Would that have changed maybe the situation? Have we had a written contract identifying responsibilities? So to answer your hypothetical, Mr. Mueller, maybe. If you look at the pattern instructions, look at the case law, you can have multiple people in control of safety, right? You don't have to have full control. You have to have some control. So if this contract is in place with McHenry, I think Abby is absolutely on the hook as well. The issue then just becomes joint sever liability. If this contract is not in place or if this contract has different language and allows Abby to defer or delegate to Campton, then we're in a Kane situation, right, where there's not this overarching agreement where you've got the bidding GC promising sole control of safety. And I think, again, these 414 cases are so fact-intensive and I feel like they get overly complex. I think, again, we need to remember, right? 414 applies generally to an employee who's hurt on the job site. But in theory, 414 applies to a person on the scene, on the site, and gets hurt, right? So let's use a hypothetical. And this is why I think it's important under 414. If, say, let's say a judge. It's a McHenry County Government Center, right? Say a judge walks out a back door. Campton's gone. Abby's gone. Falls in the hole and gets hurt, right? Who could they sue? Well, under agency principles, can they sue Abby? The way that the transcript reads, no, because Abby is an independent contractor, right? Agency law doesn't apply because the operative details and incidental work is controlled by Campton. Could they sue Campton in that situation? Absolutely. So then you flip it, right? If Abby did retain control over the operative details and the incidental work, then agency applies, and if the judge were to fall in, then he could sue Abby for the work of Campton. And that's how 414 is trying to distinguish. When does agency apply? When does some other form of liability apply, short of agency and short of lack of total control? And I think that gets lost because most of these cases deal with injured employees, which you know if an employee is injured, the remedies that they have are totally different than if a person. We don't like judges falling in holes. It's not a good idea. But I just think that's a distinction that's very important that I think the trial court misses. And I think that your honors need to figure it out because, again, if you promise to McHenry you're going to bid the contract, be the cheapest, but also, I mean, if you remember, their bid, this is in the testimony, had trenching involved, right? The bid was from Abby to McHenry. The bid was not from Campton to McHenry. Abby took Campton's bid, repurposed it, and submitted it to McHenry, promised showing, bracing, all that stuff on site. Did it – that's a question. When Campton came in to do this business with Abby, did Abby require competent persons to be on site? Was that part of the bid? I would say yes because one of the – to be honest, I don't recall if that was a bid requirement, but it's a contractual requirement. Okay. Right. The contract requires they comply with all regulations, laws, ordinances, and an OSHA-competent person is a regulation that they have to comply with. Counsel, I have a question. You know, back to 414, and Comment B indicates, and we've held before, that the general contractor's knowledge of the unsafe methods is a precondition to liability. So what are the facts that point to actual or constructive knowledge of unsafe methods? Sure. That's a good question. Again, the short answer, I think it's a question of fact for these reasons, Your Honor. And these reasons are, you know, we point to the blueprints. This is not like a discretionary call. Should we use shoring, should we not? When you reach a certain point, shoring should – has to be used. Bracing is something. Even if there is risk to a gas pipe, right, it's not going to delay the job probably, but it's not an excuse to ignore OSHA regulations to make sure you get back to the job quickly and more cost-effectively. So I think the blueprints. I think the other issue is there's an independent act of negligence based on the soil conditions, right? They should have known what the soil conditions were. They clearly didn't. They clearly were wrong. That absolutely contributed to this injury. But, you know, in this situation, they have blueprints. They know where they're digging. They know the trench. They know the depth. It's their bid. It's their contract. You know, it's their obligation to supervise solely the safety, the means, methods as it relates to safety of the work. None of the equipment on site was Abby's, correct? It was all part of Campton's – I mean, their backhoes, the lower – I mean, I learned a lot about digging. The low, the hot, the top guy, you know, but the equipment looks like it was all Campton's. So, Justice, I would agree with you as long as we limit it to the equipment being used by Campton employees. I'm sure there is other equipment on site, but as it relates to what was being done by Campton, I think that's accurate, which brings up another good point. I think it goes to your point, Justice Kennedy. The backhoe being used is not big enough to place a trench box, which is another independent fact, I think, of negligence. But who – pursuant to your contract that you've held up now I think twice, who was supposed to provide the equipment? Under the contract that promised to McHenry, it said Abby was. Okay. And so if they bring in a piece of equipment that's not sufficient to do a specific job, is that Abby's problem to correct or is it Campton's problem to correct? In this situation, in terms of this contract, which under Carney and Cain, I think is the most important piece of evidence that's controlling, it's their obligation to provide the equipment. And if they want to rely on a third party, it's their obligation under 414 to make sure that the third party is doing it in a reasonable manner, non-negligent manner. And your reference to there is Abby? Correct. Okay. All right. Justice Kennedy, do you have anything else? No. All right. You will have an opportunity to respond if you choose to. And we will now proceed with – is it – I don't know. Okay. Thank you for your time. That was good. I tried to listen first, but I wasn't sure. It's a tricky Macedonian last name, so. May it please the Court, Counsel. As previously stated, I represent the appellee, Abby Paving. Our motion for summary judgment was granted at the lower level, and we're asking it to be affirmed for two reasons. First, there's no evidence of control as required under the restatement 414,  has a right to have the equipment. Also, as the Justice brought up, there's no actual or constructive notice as also required under 414 and 343. If we look first at control, Counsel talked a lot about the possibilities. The focus of his argument, and honestly both of his briefs, talks about what Abby could have done. There are things that Abby could have done. Abby can stop work. Abby, you know, has to have oversight, which is true. No one's denying that Abby did have some general supervisory capacity and safety, and that Abby also did have the ability to stop work. That's not the question here. And that's honestly not what 414 requires when the Court does an analysis of control. The question really becomes that there needs to be some retention of supervision by a general contractor so that the plaintiff is not free to do his work in the manner he chooses or the manner his employer directs him to do so. And simply, there's no evidence of that here. Well, that's your position that there's no evidence, and if there is no evidence, why would a general contractor not have someone in constant or at least regular supervision of what's going on on his or her project? Sure, and a general contractor like Abby, and Abby did have Bob Bulow on site a few days a week and did have him there to be, again, a general supervisor, as a general contractor should be. He's there for consultation, he's there to discuss scheduling if there have been concerns that Campton had had about safety. Bob Bulow was there as someone from Campton. He was in communication with the higher level, the superintendents, Mark Peterson, Mark Bogren. But a general contractor's responsibilities, again, general supervision, Abby didn't have a more robust safety program like you see in certain cases, plaintiff cited in their brief, that maybe would rise to the level of control. The contract did, with McHenry, give them supervisory capacity over the safety. So, again, as you stated, Your Honor, there is no contract between Abby and Campton, so we don't have any sort of written explanation of the delegation of responsibilities. We do have the contract with McHenry, but that doesn't place an automatic duty to protect plaintiff, but it does have some general responsibilities for Abby, including safety responsibilities. Was it Mr. Bogren or Mr. Patterson who said that it wasn't familiar or he didn't think anybody in the company was a competent person? And that's a strange term because it means so many different things. But under OSHA, that there wasn't anybody in the company that was a competent person? I think it was Mr. Bogren that didn't necessarily understand the term. I think plaintiff was a little confused by the term as well in his testimony, Your Honor, yes. But I believe it was Mark Peterson, a higher level employee, who referred to himself as a competent person. He felt confident that the company was complying with OSHA. So I don't think that was necessarily a concern. But even if you look at the contract language here, and I know plaintiffs spend a lot of time talking about the contract, holding it up, that contract language does say what it says. The first district looked at nearly identical contract language in snow versus power construction and found that that did not rise to the level of necessary control. Again, it certainly places burdens on Abby to supervise the job site. I don't think anyone denies that. I'm certainly not arguing that here with you today. But again, regardless of that agreement language, you have to look at actual retained control. I mean, there's a difference between a general right of supervision and active system for safety enforcement. And so I believe it was this court in Kane that mentioned that, that looked at this exact same analysis. And counsel mentioned in his argument that he reversed his position on Kane. He felt it was a very good case and it was very applicable to these facts. And I do agree, but I don't think Kane necessarily helps plaintiff's position because in Kane, this court looked at the contract language but spent a lot more time looking at the evidence of actual control. Because we know it's not just some control. Counsel admitted that. There has to be enough control to show some sort of level to enact 414. And so here, the contract language is certainly not enough. I think snow echoes that and I just don't think it's strong enough. So then we have to look at actual evidence of control. You know, again, plaintiff spent a lot of time talking about what could have been done. You know, Abby can stop work. No one's saying that Abby Paving could not have the ability to stop work. I don't think there's a job site around where a general contractor can't stop work. But that's not enough. I mean, this very court in Kane said that. Well, it sounds like that even somebody who was not down in that hole, if he was walking by and was a member of either company, he could have stopped work. I mean, somebody, and in fact, somebody from Campton tried to stop work, I thought, just before the accident occurred, like watch out or something of that nature. But I remember there was somebody who shouted something out. I think it was as plaintiff was inside of the hole. Someone shouted to notice that I think the cave-in was about to happen. I do agree, yes. And that is possible and that could also go to the issue of notice. But the way that this was set up, and I know you have video footage, you can see that Bob Buelow is on site for only two to four minutes before the accident, and he's hundreds of feet away. And there's a large piece of machinery between where he is standing and where the hole is. He testified, there's no way I could have seen this hole from where I was standing. He only went after the fact. Would general supervisory, as you're explaining, Abby has general supervisory capacity, tell Abby that looking at a trench box and looking at that piece of equipment that Campton has at that hole is not going to be sufficient? Do they have the responsibility to say, hey, you need to get another piece of equipment here? And did they do that? And I think the answer to the second part is no, they didn't. But did they have a responsibility to do that? Well, the problem is, Judge, and they certainly have a responsibility to overview safety.  But, you know, general construction terms. We're talking about a specific industry with specific knowledge. This is not something that Abby does, and even I think Mark, I believe it was Mark Peterson of Campton testified at 380 at the record. For Abby to even know where we're digging, the depth we're digging, that's something they would never really be involved in. How would they know whether the trenching needs shoring or not? It starts with my crew on the ground and our responsibility to dig it out properly. This is an industry-specific issue, this decision of whether or not to use shoring or a trench box. I know counsel in his argument mentioned something about the soil conditions and that somehow Abby had knowledge or notice of improper soil conditions. There is nothing in the record to suggest that. I think the court even found that Abby did not have any information. Correct. And so when you look at the issue of trenching, you have to look at what goes into that decision process. And I know this really goes more to notice, but plaintiffs talked about OSHA regulations that require trenching at certain depths. There's not a single OSHA regulation cited by plaintiffs to that point, so I'm not familiar with this specific OSHA requirement for shoring at a particular depth. The record does have testimony that shows that Campton's practice was that four or five feet was typically the depth in which they would consider using either shoring or a trench box. But as the record also shows, there's a number of factors that go into whether or not to use trenching or shoring. It's not just depth. You have to look at the soil conditions, as your Honor mentioned. You have to look at the space and the equipment used. And those are all things that Campton testified. We decide that when we're digging out this trench. As they start to dig, that's obviously when the soil conditions become apparent. And so those are all factors. But again, those are all things under Campton's control as they dig out these trenches. What was the testimony concerning the time in which, you know, in terms of once they start digging, that's when you would expect to determine soil conditions. But was there some testimony as to discovering that before you've actually opened up a hole? There was no testimony regarding... So, Campton's own safety manual placed a responsibility on Campton to do a soil inspection. That's part of their practice. And so there was some testimony when Campton employees were asked, did you do these inspections? Did you look at the soil? Did you evaluate it? And I believe all of them said no, that we actually end up doing it as we're digging out the trench. And so you're correct on timing. I believe all of the Campton testimony said their practice, including plaintiff's testimony, is that as they would get to a section of trench, they would dig it out, immediately get inside the trench, replace the pipe, assess the conditions, figure out if they need to do shoring. Replacement's done. They come out. The hole is immediately backfilled. And so, yeah, the testimony is that it would take no more than an hour. And so I think counsel said there's a question of facts on the timing. And this is a weird case that there's actually a video that we can kind of, you know, that's a rare circumstance, right? There's no question of fact here on the timing here with this trench. I mean, Bobulo, undisputed, wasn't on site when this trench was dug out. Everyone from Campton agrees they did not see Bobulo that day. They had not interacted with him. So only Campton was there when this trench was dug out. It was dug out by Campton immediately before and then used, and then actually it caved in before they completed the work. So it's fair to presume that less than an hour had passed. So if we're looking at constructive notice, which usually does revolve around the amount of time that was available for AGC to be able to see it, here we're talking about something that was available for far less than an hour. So there's really no question of fact. Bobulo testified that Bobulo would tell him where to go the next morning, where the crew had to be, that he would tell Bobulo and his crew where they needed to be. I think it was testimony. That's C-5 Osprey. That they would have daily communications. He wouldn't be present on site every day, but Bobulo would check in at the end of each day and tell them where to go. Is that not accurate? That is accurate, George, and that would go to the supervisory capacity of scheduling for a general contractor. That's a typical practice of a general contractor, to discuss the timing. But even if you look at that quote that I read previously from Mark Peterson, also on the record at 380, to Abby, even to know where we're digging or the depth, that's something they would not be involved in. So there was general discussions between Bobulo and Mark Peterson about scheduling. It's important to make sure the work is working on schedule, and contractors have to follow each other. So those conversations were had. All right. So Bobulo did not tell them exactly where to go. That is correct. One part to date. Yes. So Mr. Bobulo was not responsible for directing their work. I believe Justice asked about the amount of equipment. All of the equipment that Campton used was exclusively Campton's equipment. Counselor mentioned there was a question of fact about the trench box that was available on site. There is no question of fact. I believe Plaintiff said he didn't recall whether there was one, but several other Campton employees did testify there was a trench box on site. In fact, they had used one on this very project. At least I think they approximated 55% of the time. So it was available. Campton had a trench box. Although also, by the way, there are other methods, including shoring, that can be used as well. So Campton had options. There's not really a question that they were deprived of anything or didn't have equipment. They received all of their daily instruction from Campton exclusively, which I know is a relevant factor this Court also looked at at Kane. Plaintiff mentioned in his argument the discussion of OSHA. And I know I mentioned it briefly before that there's no OSHA requirement of a certain depth that can be cited. Plaintiff certainly didn't cite one in any of his briefs or his argument. But he also mentions after the fact, that discussion that was had about OSHA training between Fabulo and Mark Fogren, or Mark Peterson, I'm sorry, of Campton Construction. And I believe the testimony, if you look at the record at 554, there is a discussion, although it's not clear whether or not Abby actually demanded or directed them to do this OSHA training. It was more, we discussed OSHA training. I'm sure they did it because, you know, they're a good company. But even still, compliance with OSHA does not rise to the level of retained control. And actually, this very Court looked at that issue in Kane versus Joe Cantorino 10 years ago. Specifically looked at that issue there, where in that case, actually, there was more safety oversight in Kane than there even was here. But realistically in Kane, they asked, you have to comply with OSHA. And that was before the accident in Kane. But here you've got after the fact. So already there's no control before. But you can't say compliance with government organizations like OSHA would rise to additional control when this Court already looked at that. I mean, realistically, it's control by OSHA. It's not control by Abby Pavin. It's saying, hey, are you complying with these government organizations or these government regulations? Well, the cases that have discussed 414 seem to continually talk about control over incidental aspects. What's the definition or what's an identification of an incidental aspect? I think an incidental aspect, a lot of times you hear the terms in case law, means and methods. I know a lot of construction workers use the phrase means and methods. I think it goes back to what I was saying at the beginning, that you have to look at whether or not the contractor, Campton, is free to do their daily work in a manner that they choose. You know, are they able to do these daily tasks, whether it's the digging, you know, in that way. And so I think that goes here to who is giving Campton employees their instructions? Who is actually the ones that are giving them their equipment? And I think that's pretty clear here. It's undisputed that that would be Campton exclusively. Well, we're talking, and now we're talking about facts as opposed to law. So if this is a very fact-driven industry, and it appears to be, and you've even argued that it is a fact-driven industry, as did Mr. Kernauer, wouldn't an incidental, what's an incidental aspect be a material fact that would need to be determined outside of a motion for summary judgment? It wouldn't, because Carney v. Union Pacific says a question of control is a question of law that can be decided by a court. But as long as there are no questions, you can finish your thought. Here's a timer, and you may need to stop. The cookies are ready, but you can finish your thought. Understandably so. So it is a question of law. And so there's no question that it's an appropriate for this, in this court, and it was appropriate for our motion for summary judgment. So based on our brief and this argument, we would ask you to affirm the motion for summary judgment on both counts. Is there going to be anything else? All right. Thank you very much. Thank you so much. Mr. Kernauer, if you wish to proceed, you may do so at this time. Thank you, Justice. I'll be brief, obviously. I've only got five minutes. We don't like promises like that. Thank you. To kind of segue off your question about what does incidental mean, and this is the confusion I think Carney talks about. A lot of people think you need control and supervision, and Carney is clear, and the comment is clear. You can have control over the incidental means, methods, manners, or the supervision. That's why the comment is so important. It's apparently the same with Carney, which I think does a good job kind of fairing out the nuances of 414. And it states, based on the comment. Well, if incidental aspects is also sort of synonymous with means and methods, don't we have pretty much agreement in this case via depositions, via affidavits that the means and methods have been identified? The means and methods have been identified. The issue is what control did they have. I don't think you're going to find any case where there's any GC that's going to come in and say I control the means and method of the sub who I hired to do the work. That's not the issue. If they control the incidentals to that level, 414 doesn't apply because agency law takes over, and then you can have vicarious liability. This is about direct liability to Abby. And Carney is clear. If you have a duty under 414, which, as I've stated, McKinney contract creates that duty for them. They promised it. They were going to be bound by it. If you then have the power to forbid work being done in a manner likely to be dangerous to himself or others, it is no defense that you can just say, well, we could have done more, but we just chose not to do anything to fulfill our duty. That's the act of negligence, right, doing nothing in that situation. It's not a situation where they didn't have a duty, so they didn't do any kind of a segue to the next case, any voluntary undertaking to create the duty. They made the promises, and by doing nothing is an absolute breach of that duty under 414. And the focus on incidental method manner is a right-hearing one. The contract only has to give them some type of control of the supervision of the safety, and then comment C goes to they just have to not be entirely free, entirely free to do the work in any way they want. And that's where the case all distinguishes. There's some cases with good contracts to the sub saying we control, you have no role in what we do, leave us alone, we're going to do our job, and, you know, that's the extent of it. The Snow case that they bring up, there is a subcontractor agreement in place between the contractor and the sub, which, as your honors know, there is no subcontractor agreement in this place. So would that have helped the situation? I mean, these companies apparently have worked together for some time. And Abby says, hey, we're not excavators, we do this. Wouldn't that have been best practice in this case to have that type of a contractual relationship? It would have been best practice. I think it would have been. I mean, that's a more legally operative fact than just saying we had no agreement. I mean, there's been no testimony of any verbal agreement. It's just, no, they know each other. Obviously, they work well together, and it's common in a lot of cases, right? They've done work together for 20 years. And even in those cases, there's contracts between the contractor and the sub, outlining, delegating responsibility. The record doesn't indicate that they have any other relationship, like familial, somebody in the family works with one or the other. It's just they've worked together for some time, correct? I believe Mr. Nisnerff actually is related to one of the owners of Campton, but not necessarily Abby. Okay. And that's in his testimony. He's the brother-in-law to someone. You know, the dig time, Justice Kennedy, I think it's a issue of fact, Bob Buelow testified he thought the dig started the day before. Again, at this stage of the proceedings, I don't think you can arrive to any conclusion as to dig time. Well, even if it did start the day before, how is that going to be a question of fact material to this injury? Well, because at that point, you know what the depth of the trench is going to be, where it's got to be at, so they should have the proper, make sure the proper equipment is on site to, A, do the trenching, the bracing, the shoring, the leveling, and you have the appropriate size excavator that can lower in the equipment necessary to do the bracing and shoring. Is there a reg as to the depths? Is there an OSHA reg, or is that just the practice? There is, and I guess I probably didn't realize this was a disputed issue. I mean, the court can take traditionalist regulations. There's an OSHA reg. They were cited by OSHA for violating the reg. I was trying to breeze through the transcript, but ran out of time. Yes, there is absolutely regulation, and at the wanted trial, I would expect an IPI-60 instruction outlining that regulation. With that, unless you have any further questions, I have nothing else to hammer on. No, we do not. Thank you. Thank you both for your argument this morning. Justice Jorgensen will, in fact, review this, and we will make a decision in due course. And because we had just a little bit of time, I will tell you that, A, Judge, this one, when the building was being extended back in 1992, I was still in McHenry County,  and my window no longer exists, but all the steel is out there. And one day I was sitting working on a decision, and a huge girder hit that window. And I jumped. So you were sitting? The window was just about five feet away from where I was sitting. And within five minutes, the supervisor came up with a yellow helmet that had my name on it, and he suggested that maybe I want to wear it when I'm in chambers. So I know what it's like to be surprised. Thank you very much. All rise.